UNITED STATES of America,
Plaintiff-Appellee,

v.

John E. TEST, Defendant-Appellant.

No. 73–1337.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Sept. 13, 1973.

Decided Nov. 1, 1973.

Rehearing Denied Nov. 26, 1973.

James L. Treece, U. S. Atty., and J. Terry Wiggins, Asst. U. S. Atty., Denver, Colo., for plaintiff-appellee.

Louis M. Fischer and Walter L. Gerash, Denver, Colo., for defendant-appellant.

Before CLARK,[*] Associate Justice, and SETH and McWILLIAMS, Circuit Judges.

PER CURIAM:

Appellant John E. Test stands convicted by a jury on a one count indictment charging him with knowingly and intentionally distributing a controlled substance, to wit: Lysergic acid diethylamide (LSD) in violation of 21 U.S.C. § 841.[1] On this appeal Test presents several questions but only two have substance, i. e., (1) Was Test entrapped as a matter of law and (2) Did he have the specific intent required by the statute. We have concluded that neither point has merit and, therefore, affirm the conviction.

1. *Facts and Circumstances:*

John Test first met Peter Brophy, the Government informer, in October, 1971, as a customer at Brophy's fish market, Seafood Limited, located in the Happy Canyon Shopping Center in Denver, Colorado. During the next several months Test and Brophy developed a friendship. Test performed odd jobs at Seafood Limited and he and Brophy drank beer together occasionally; Test was invited to Brophy's home and met his wife. It appears that at various unspecified times Brophy told Test that he had prior dealings in smuggling marijuana from Mexico to California, that he was a pilot and had used a plane to bring the contraband into the United States, and that he had invested his illegal profits in Seafood Limited. None of Brophy's accounts of his trafficking in illicit drugs was true.

By February 24, 1972, the relationship having continued, Brophy told Test that he would like to have a few tablets to give some friends; and Test obligingly produced seven tablets in a tinfoil packet which he said were "probably mescaline and acid." Brophy turned the tablets over to Agents Ercole and Lochridge of the Bureau of Narcotics and Dangerous Drugs; and a laboratory test revealed that they were LSD cut by a large amount of stearic acid. Test denied giving the tablets to Brophy. On March 13, 1972 Brophy called Agent Allen of the Bureau and arranged for Allen to come to Seafood Limited to meet Test. Neither Brophy nor Test had met Allen previously. Allen posed as Tom Stone, a ski instructor at Aspen and former associate of Brophy in the drug traffic in California. Allen testified that he told Test that he wanted to buy some cocaine and that Test told him "he had a connection for cocaine who could sell pound quantities . . ." quoting a price of $11,000 per pound. They discussed the purchase of approximately two to five pounds. In addition Test said he "could supply . . . marijuana, hashish, LSD and amphetamines." No sale or distribution was made at this meeting.

A second meeting between Agent Allen and Test occurred on March 15, 1972. While Brophy's part in the meeting is somewhat hazy, it appears that he overheard "a lot of the talk" but was not an active participant. Test told Allen that "there would be a delay in the delivery of the cocaine" but that "he had been successful in reducing the price of cocaine from $11,000 to $10,500" and

---

[*] Associate Justice, United States Supreme Court, Retired, sitting by designation.

1. 21 U.S.C. § 841 provides in pertinent part:
"Unlawful acts.
   (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance".
21 U.S.C. § 812 specifies that Lysergic acid diethylamide is a Schedule I controlled substance.

that he "had access to 40 pounds of marijuana which he would be willing to sell for $145 a pound." As to cocaine, the two discussed a purchase price of $42,000 for four pounds. Apparently both parties then endeavored to make a showing of good faith. Agent Allen displayed $15,000 in Government funds (Test claimed it was $50,000) in the trunk of his car. Test gave Allen a marijuana cigarette saying that he hoped he enjoyed smoking it. When it became apparent, however, that Test could not produce any cocaine, Allen said: "I have to show my people something" and asked Test "if he could get any other substances." Test replied "that he might be able to get him some mescaline."

Subsequently, on March 27, 1972, Brophy contacted Agent Allen to set up a meeting for the purchase of 1,000 tablets of what was alleged to be mescaline. Allen met Test the next day at Seafood Limited. The sale was made inside a Government car parked in the shopping center parking lot. Allen paid Test $450 and received approximately 1000 tablets in a plastic bag. Test told Allen that the tablets "were stamped out by his friends" and that "he could get 50,000 tablets more." He testified that he had purchased the tablets two days earlier from two friends in Pine, Colorado paying $400 for them and leaving him a $50 profit on the deal.

Agent Allen testified that when he purchased the tablets, he believed them to be LSD. "Most of the drugs," he said, "that we have encountered that have been referred to us, chocolate mescaline as they were called, in fact turned out to be LSD." Subsequent laboratory analysis of the actual 1,018 brown tablets received by Agent Allen disclosed that they contained LSD cut by phencyclidine (PCP). The Government's expert witness, Mr. Ruybal, a forensic chemist with the Bureau of Narcotics and Dangerous Drugs, testified at the trial that he had analysed more than five hundred separate samples of drugs denoted as mescaline but that they normally did not contain mescaline but were usually LSD by itself, PCP by itself, or LSD cut by PCP. He stated that PCP was a normal cutting agent for LSD.

2. *Entrapment:*

Test asserts that he was unquestionably entrapped as a matter of law and should, therefore, have been acquitted. His claim is based on Brophy's alleged exploitation of their friendship to set him up for the drug deal with Agent Allen, Brophy's false stories of his prior drug exploits, his introduction of Agent Allen under false pretenses, Agent Allen's repeated requests for the production of drugs, and his showing of a large sum of money despite the fact that Brophy and Allen knew Test had no prior criminal record but kept after him on the theory that he might have known some large drug traffickers.

■ Entrapment is a "relatively limited defense." United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). Entrapment as a matter of law is the more limited in terms of its availability. It is rudimentary that entrapment as a matter of law can only be found where it appears unmistakably clear to the trial judge that undisputed evidence establishes that the criminal design originated with Government agents, was the product of their creative activity and was implanted in the mind of an otherwise innocent person totally lacking the requisite predisposition to commit the crime. Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L. Ed. 413 (1932), Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L. Ed.2d 848 (1958).

■ In *Sorrells, supra,* the Supreme Court stated that when a defendant claims entrapment:

"The government in such a case is in no position to object to evidence of the activities of its representatives in relation to the accused, and if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry

into his own conduct and predisposition as bearing upon that issue. If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense." 287 U.S. at 451, 452, 53 S.Ct. at 216.

In line with this concept, this court has exhaustively scrutinized the record examining the conduct of informer Brophy, of Special Agent Allen as well as the conduct and predisposition of Test. Construing the evidence in the light most favorable to the Government, as we are required to do, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we are not persuaded that the conduct of the Government's agent and informer was so improper, overzealous or otherwise offensive as to amount to entrapment as a matter of law. As the Supreme Court said in United States v. Russell, *supra:* "*Sorrells* and *Sherman* both recognize 'that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution,' 287 U.S., at 441 [53 S.Ct. 210]; 356 U.S., at 372 [78 S.Ct. 819]. Nor will the mere fact of deceit defeat a prosecution, see, *e. g.,* Lewis v. United States, 385 U.S. 206, 208–209 [87 S.Ct. 424, 17 L.Ed.2d 312] (1966), for there are circumstances when the use of deceit is the only practicable law enforcement technique available." At 435–436 of 411 U.S., at 1644–1645 of 93 S.Ct.

Here, Test contends he was tricked and enticed by his friend Brophy—their friendship exploited. There is no evidence in the record which conclusively establishes that Brophy was a paid Government informer when he first met Test. Nevertheless it is true that Test's friendship with Brophy had a bearing on Test's delivery of the seven tablets on February 24, 1972. However, Test was not indicted or convicted for this distribution. Brophy did utilize his friendship with Test to introduce him to Agent Allen but thereafter played a decidedly unobtrusive role in the course of events leading up to Test's transaction with Agent Allen on March 28th. Neither this mere introduction nor his actions as a go-between for Allen and Test in arranging their meetings rises to the level of entrapment as a matter of law. Nor can Test successfully argue that his friendship with Brophy had such a compelling spillover effect on him *vis-a-vis* his relationship with Agent Allen that he was rendered powerless to distinguish between right and wrong or to refuse to cooperate with Agent Allen. Allen's requests for the production of drugs are a judicially acceptable tactic especially since the solicitations involved here were met with very little, if any, firm reluctance on Test's part. Furthermore, there is no evidence that Allen threatened, cajoled or browbeat Test. Indeed, Test volunteered extensive information about his drug connections, what types and quantities of drugs were available and presented Allen with various options and alternatives. Nor was Agent Allen's display of cash a fatal flaw in the case when viewed in the context of the negotiations at that point. It was merely a showing of good faith. Test's *quid pro quo* was the gift of a marijuana cigarette. Finally, all the evidence concerning Test's continuous pattern of illicit drug activities and his state of mind as revealed by his highly significant admissions at the trial is convincing proof that he was no cats-paw for Brophy but was in reality a drug trafficker. He fails to qualify as the "unwary innocent" victimized by a pernicious criminal scheme wholly manufactured by law enforcement officers. Sherman v. United States, *supra,* at 372 of 356 U.S., 78 S. Ct. 819. His lack of a prior criminal record, contrary to his claim, is not exculpatory.

■ Although the trial judge found, and we agree, that there was no entrapment as a matter of law in this case, the Government, citing Martinez v. United States, 373 F.2d 810 (10th Cir. 1967), contends that Test was not entitled to have the entrapment issue submitted to the jury because he pled not guilty to

the offense charged. Whether or not this be so as a general rule,[2] a matter we do not reach, it is clear that the Government's case here was in no wise prejudiced by the submission because the jury found with the Government.

3. *Specific Intent:*

Test's second line of defense is that he lacked the specific intent required by the statue to commit the offense for which he was convicted. He claims a judgment of acquittal should have been entered on the grounds that he did not knowingly and intentionally distribute LSD, "although he may have had the intent to distribute mescaline." At the trial Test testified that he told Agent Allen that he "might be able to get him some mescaline," that subsequently he "purchased the mescaline" for $400, that he sampled the tablets to be sure they were not LSD, and that he dispensed over one thousand tablets to Agent Allen on March 28, 1972, two days after he purchased them, for $450. He stated he knew LSD was illegal but "wasn't sure" about mescaline.

■■ Unquestionably it is the province of the jury to pass upon guilt or innocence. Sinclair v. United States, 279 U.S. 749, 765, 49 S.Ct. 471, 73 L.Ed. 938 (1929). Where, as here, an essential element of the offense charged is the specific intent to commit it, the issue of intent is to be submitted to the jury. Screws v. United States, 325 U.S. 91, 106–107, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). Whether or not Test knew the character of the substance he was distributing or that his distribution was an illegal act is not for this court to say. It is the jury's function and duty to weigh the conflicting evidence and draw reasonable inferences therefrom in making its judgment. And any claimed ignorance of the law on Test's part is no excuse. United States v. International Minerals & Chemical Corporation, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971).

We believe there was substantial credible evidence before the jury, both direct and demonstrative, from which it could justly reach its verdict, and we are bound to sustain it. Glasser v. United States, *supra,* at 80 of 315 U.S., 62 S.Ct. 457. To hold otherwise would precipitate a headon collision with the Seventh Amendment. U.S.Const. Amend. VII, Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd. et al., 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962).

We have closely examined appellant's other contentions and find no merit in them. Accordingly, the judgment of conviction is affirmed.

Affirmed.

---

2. See, Sorrells v. United States, 287 U.S. at 439, 451–452, 53 S.Ct. 210.