753 A.2d 1019 (2000)
In re B.B.P.
J.P., Appellant.
No. 97-FS-1160.
District of Columbia Court of Appeals.
Submitted January 21, 1999.
Decided June 15, 2000.
Francis T. Lacey, Rockville, MD, appointed by the court, was on the brief for appellant.
Sumner J. Katz, Washington, DC, appointed by the court, was on the brief for appellee B.B.P.
Jo Anne Robinson, Principal Deputy Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Erica L. Easton and Sheila Kaplan, Assistant Corporation Counsel, were on the brief for appellee District of Columbia.
Before TERRY and STEADMAN, Associate Judges, and GALLAGHER, Senior Judge.
TERRY, Associate Judge:
This is an appeal from an order adjudicating B.B.P. a neglected child. Appellant J.P., the child's mother, claims that this ruling was erroneous because the District of Columbia filed its neglect petition too soon. The District argues that even if the petition was premature, the mother's conduct between the time of the child's birth and the neglect hearing justified the *1020 court's ultimate decision. Because we conclude that the petition was timely, we affirm.

I
The pertinent facts are not in dispute. Late in November of 1996, J.P. moved to the District of Columbia from Buffalo, New York. On January 30, 1997, she was taken by ambulance to Providence Hospital, where she gave birth to B.B.P. When J.P. left the hospital the next day, she told Melanie Sachs, a hospital social worker, that she would be staying with her mother at an address on Second Street, N.E., even though her four other children were all living in Buffalo. J.P. said that B.B.P., who had been born prematurely and weighed less than four pounds, would join her at her mother's apartment when he was ready to be discharged from the hospital.[1]
During the next two weeks, J.P. neither visited B.B.P. nor returned to the hospital to make plans for his discharge, though she did call the nursery three times to ask about him. Sylvia Jefferson, a social worker with the Department of Human Services (DHS), made repeated attempts to contact J.P. at her mother's address,[2] but the only response she ever received was a telephone message from J.P. on February 13 which contained no information as to how J.P. could be reached.[3]
On February 13 the District filed a neglect petition on B.B.P.'s behalf under paragraphs (A) and (G) of D.C.Code § 16-2301(9) (1996).[4] The trial court appointed counsel for J.P., scheduled a status hearing for March 11, and ordered B.B.P. placed in shelter care. B.B.P. was discharged from the hospital into the care of DHS on February 18.
Finally, on March 5, J.P. called Ms. Sachs at the hospital to find out "what was going on" with B.B.P. She explained that the reason she had not been in contact with Ms. Sachs previously was that she had gone to Buffalo to take care of some family problems. Ms. Sachs informed J.P. that B.B.P. had been placed in the care of DHS and instructed her to contact Sylvia Jefferson, the DHS social worker assigned to the case.
A fact-finding hearing on the neglect petition was held on May 12. Although J.P. did not appear personally, she was represented by counsel, who conceded that J.P. had notice of the hearing date and did not object to going forward with the hearing without her presence. The trial court, after receiving testimony from Ms. Jefferson and Ms. Sachs, found that B.B.P. had "resided at the [hospital] for more than ten calendar days following his birth despite a medical determination that he was ready for discharge" and ruled that the mother's three telephone calls to the hospital were insufficient to satisfy the statute's requirement of "reasonable efforts to maintain a parental relationship." The court concluded that B.B.P. was both "abandoned" within *1021 the meaning of D.C.Code §§ 16-2301(9)(A) and 16-2316(d)(4) and "neglected" within the meaning of D.C.Code § 16-2301(9)(G). At a disposition hearing a few weeks later, on June 23, B.B.P. was committed to the custody of DHS.[5]

II
D.C.Code § 16-2316(d) provides in part:
Where the petition alleges a child is abandoned as referred to in section 16-2301(9)(A). . . the following evidence shall be sufficient to justify an inference of neglect: . . .
(4) the child has resided in a hospital located in the District of Columbia for at least 10 calendar days following the birth of the child, despite a medical determination that the child was ready for discharge from the hospital, and the parent, guardian, or custodian of the child did not undertake any action or make any effort to maintain a parental, guardianship, or custodial relationship or contact with the child. [Emphasis added.]
B.B.P. and the District argue that the statutory requirements should be analyzed separately and independently, and contend that the ten-day period mentioned in the statute "refers specifically and only to the length of time the infant is in the hospital." Therefore, they maintain, as long as a child has been at the hospital for more than ten days after birth, and a medical determination of fitness for discharge is made at some point before a neglect petition is filed, the petition is timely.
J.P. contends, on the other hand, that the statutory requirements must be read concurrently. Thus, according to J.P., the statute requires a medical determination that the child is fit to be discharged during the entire ten-day period in which the child resides in the hospital. In other words, J.P. maintains that a child must remain in the hospital for ten days after a medical determination of fitness for discharge has been made before a neglect petition may be filed.
The trial court adopted the construction of the statute advanced by B.B.P. and the District, interpreting it to require "that the child has been in the hospital for ten days, that a medical determination has been made that the child is ready for discharge, and that the parent . . . has not taken any action or made any effort to maintain a parental relationship." J.P. now argues that this reading was erroneous.
As always, when called upon to interpret a statute, we look first to the plain meaning of the language used, for that is generally the best indication of the legislative intent. See, e.g., Varela v. Hi-Lo Powered Stirrups, Inc., 424 A.2d 61, 64 (D.C.1980) (en banc). The dispute in this case centers on the meaning of the word "despite" as it is used in section 16-2316(d)(4). The dictionary definition of "despite" is "without deterrence or prevention by." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 615 (1976). It is synonymous with "in spite of" or "notwithstanding," id., and "impl[ies] that something is true even though there are obstacles or opposing conditions." RANDOM HOUSE COLLEGE DICTIONARY 910 (1980).
The word thus suggests a temporal concurrence of two different states of affairs, which lends some support to J.P.'s interpretation of the statute as requiring that a determination that the child is medically fit for discharge exist concurrently with the ten days in which the child resides at the hospital. The alternative construction which the trial court adopted, however, is neither illogical nor necessarily inconsistent with the statutory language. The statute could just as easily be read to mean that the necessary medical determination must coincide with the fact that the *1022 child has already been in the hospital for at least ten days.
Thus we cannot say in this case that "the [statutory] language is plain and admits of no more than one meaning." Davis v. United States, 397 A.2d 951, 956 (D.C.1979). We conclude, to the contrary, that section 16-2316(d)(4) may be read at least two different ways.[6] We must therefore look to the legislative history of the statute in order to ascertain the intent of the legislature, which in this instance is the Council of the District of Columbia. Id.; see also Peoples Drug Stores, Inc. v. District of Columbia, 470 A.2d 751, 754 (D.C.1983) (en banc) (even when the words of a statute appear to have "superficial clarity," courts may "refuse to adhere strictly to the plain wording of a statute in order `to effectuate the legislative purpose'" (citation omitted)).
The Infant and Child Abandonment Prevention Act, of which the statute at issue is a part, was adopted to deal with the problem of so-called "boarder babies," infants who are left or abandoned at hospitals even though there is no medical reason for them to remain there. See COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON HUMAN SERVICES, REPORT ON BILL 8-404, at 2 (1990) (hereafter "Committee Report"). Most of these babies are born to drug-abusing mothers.[7]Id. In 1989, the year before the law's enactment, more than 101 boarder babies resided in District hospitals. According to a study cited by the Council, the average stay for boarder babies at one local hospital was 124 days. Id. at 3. The Committee Report stressed that "a hospital is not a proper environment for a healthy baby" because hospitals lack the resources to provide the requisite amount of care and attention needed to assure the proper development of a young child, and because a hospital environment presents added health risks in the form of viral and bacterial infections. Id. at 4. The Committee also noted the high cost to hospitals of caring for these infants. One hospital, for example, estimated an average monthly cost of $13,380 per boarder baby in 1989. The Committee expressed concern that these costs would adversely affect the ability of hospitals to provide quality care to sick infants and other needy patients. Id.
A primary goal of the legislation was to facilitate the speedy adoption of children whose natural parents have demonstrated themselves to be unfit. An adjudication of neglect or abandonment is a prerequisite to the eventual termination of parental rights, which in turn is necessary to make the child eligible for adoption. Hence, by establishing a quicker process for adjudicating a child neglected or abandoned, the Council sought to create a mechanism for making these boarder babies available for adoption sooner. Committee Report at 6-7; see also In re T.M., 665 A.2d 207, 212 (D.C.1995) (recognizing the intent of the Council to provide for early termination of parental rights in order to make a child eligible for adoption).
As the Committee recognized, "abandonment . . . is determined by the conduct of the parent . . . ." Committee Report at 6; see In re Dom. L.S., 722 A.2d 343, 347 (D.C.1998) ("[a]n adjudication of neglect focuses on the misconduct of the parent in relationship to the child's welfare").

*1023 In situations when an infant has been abandoned in a hospital from birth, despite the fact that he or she is medically ready for discharge . . . [m]any would contend that this type of action is unquestionably indicative of unfit parenthood.
Committee Report at 6. Addressing the type of conduct that would suffice to demonstrate an effort or intent to maintain a parental relationship, the Committee said:
The terms maintaining a parental, guardianship, or custodial relationship should be interpreted to mean visits to see the child, expressions of affection for the child, bringing the child gifts, inquiring from the medical personnel of the hospital as to the medical, physical, or mental well being of the child, or other conduct indicating concern or interest in the well being of the child.
Id. at 11-12. J.P.'s conduct during the time that her child remained in the hospital after his birth fell conspicuously short of this standard. Indeed, during the entire three and a half months between the birth of B.B.P. and the adjudication of neglect, J.P. made, at most, four phone calls to inquire about her son. Not once did she attempt to visit him, or even indicate that she desired to do so. The trial court found that J.P.'s minimal efforts "did not amount to [her] making any effort to maintain a parental relationship or contact with the child," and that there was "[no] indication of her . . . making any effort to have any involvement with the child since [his birth]." These findings are supported by the evidence and are essentially undisputed.
The legislative history, as we read it, reflects an intent on the part of the Council to deal with the problem of boarder babies by minimizing the amount of time they remain in a hospital with no medical reason for them to be there, after it has become evident that they have been abandoned by a parent. Viewing the statutory language in this light, we conclude that when, as in this case, a parent plainly fails to demonstrate any intention to establish and maintain a relationship with her child after more than ten days have passed since the child's birth, and the child is medically fit to be discharged, the statutory requirements for the filing of a neglect petition have been satisfied. Accordingly, the trial court's order adjudicating B.B.P. to be a neglected child is
Affirmed.[8]
NOTES
[1] There was evidence suggesting that B.B.P.'s poor condition might have been attributable to his mother's drug use. A blood test administered to J.P. when she gave birth yielded a positive result for cocaine, and the residence from which she was taken to the hospital by ambulance was reputed to be a "crack house."
[2] Ms. Jefferson sent a certified letter and posted numerous messages on the door of the mother's apartment.
[3] J.P. said that she did not leave a phone number because her mother did not have a phone.
[4] D.C.Code § 16-2301(9) provides in part:

The term "neglected child" means a child:
(A) who has been abandoned or abused by his or her parent, guardian, or other custodian; or . . .
(G) who has resided in a hospital located in the District of Columbia for at least 10 calendar days following the birth of the child, despite a medical determination that the child is ready for discharge from the hospital, and the parent, guardian, or custodian of the child has not taken any action or made any effort to maintain a parental, guardianship, or custodial relationship or contact with the child.
[5] A petition to terminate J.P.'s parental rights with respect to B.B.P. has since been filed, but that is not before us on this appeal.
[6] The statute's ambiguity was evident at the May 12 hearing. At one point, the court asked counsel for the District whether he understood the statute "to mean that the child has to reside [in the hospital] ten calendar days following the determination that the child is ready for medical discharge?" Counsel first answered "Yes," but when the court pointed out that the petition in this case was filed only three days after that determination had been made, counsel added that the statute "can also be read to be ten days from the time of making the discharge plan while the child was in the hospital." It is unclear what counsel meant by that statement, and the District's brief on appeal does not provide any further enlightenment.
[7] See note 1, supra.
[8] The District argues in the alternative that even if the petition was filed prematurely, the trial court's final decision should be affirmed because of the mother's conduct in the months following her son's birth. Because we agree with and adopt the trial court's reading of sections 16-2301(9)(G) and 16-2316(d)(4), we need not decide what effect, if any, the premature filing of a neglect petition might have on an otherwise justified adjudication of neglect.