Larry A. GAUSE, Karlepa
Wilkey, Appellants,

v.

UNITED STATES, Appellee.

Nos. 06–CF–20, 06–CF–47.

District of Columbia Court of Appeals.

Argued June 17, 2008.

Decided Oct. 30, 2008.

---

Mikel–Meredith Weidman, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant Gause.

Peter H. Meyers, Washington, appointed by the court, for appellant Wilkey.

Mary B. McCord, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III and Valinda Jones, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY and THOMPSON, Associate Judges, and SCHWELB, Senior Judge.

SCHWELB, Senior Judge:

Following a jury trial, Larry A. Gause and Karlepa Wilkey were convicted of armed robbery of a senior citizen and of several related weapons offenses. On appeal, appellants contend, as they did in the trial court, that the trial judge erred by denying Gause's request for discovery, joined by Wilkey, relating to jury-selection records and certain other jury information. The judge denied Gause's motion (the Jury Motion), as well as Gause's request for discovery, upon the ground that Gause had failed to present a *prima facie* case in support of his claim that the Superior Court's system for the selection of jurors violates the Fifth and Sixth Amendments and the District of Columbia Jury System Act (DCJSA), D.C.Code §§ 11–1901 *et seq.* (2001). In its brief to this court and at oral argument, the government, while urging affirmance on other grounds, has expressly agreed with appellants' position that no showing of a *prima facie* case was required.

Given the posture of the case as it has been presented to us, we agree that the Jury Motion was erroneously denied, at least on the grounds stated by the judge.[1]

---

1. Gause's "Motion to Challenge Method of Jury Selection and Request for Discovery and Disclosure of Jury Documents Pursuant to D.C.Code § 11–1910" (the Jury Motion) was filed six days before the scheduled trial date of October 17, 2005, with a weekend intervening between filing and trial. The motion was thus arguably untimely. *See* Super. Ct.Crim. R. 47–I(c) (pretrial motions must be filed within twenty days of status hearing); Super. Ct.Crim. R. 45(a) (opposing party has ten business days to respond). *But cf.* D.C.Code § 11–1910(a) "[a] challenge shall be brought and decided before any individual juror is examined, unless the [c]ourt orders otherwise." In his Reply Brief, which speaks for

We remand the case to the trial court for reconsideration of appellants' request for discovery in conformity with the legal principles set forth in this opinion.

In his brief on appeal, Wilkey has presented several other claims. Gause has not joined in any of Wilkey's separate contentions, and none of them warrants reversal of Wilkey's conviction. See footnote 17, *infra.*

## I.

## THE EVIDENCE

The government's evidence showed that on July 1, 2005, two men, who were later identified as Wilkey and Gause, robbed John Jeffers, then sixty-three years of age, at an ATM machine in southeast Washington, D.C. They took Jeffers' wallet, as well as the twenty dollar bill that he had withdrawn from the ATM. One of the robbers—apparently Wilkey—was armed with a sawed-off shotgun, which was wrapped in a newspaper. The robbers fled, and Jeffers called 911 from a nearby convenience store. An officer responded, and Jeffers provided a description of the robbers.

The officer promptly relayed that description over a police radio channel.

A short time later, a second officer observed two men, who roughly fit the description provided by Jeffers, at a location approximately four blocks from the scene of the robbery. The officer, who was wearing a police badge, made eye contact with the men, and he began to alight from his unmarked police vehicle. The two men "took off running." The officer gave chase, but he lost sight of them as they were nearing a creek bed.

Several other officers established a perimeter around the creek bed, and they began to search for the robbers. The officers soon found Wilkey and Gause, who were attempting to hide and were lying side-by-side under some bushes. On or near the two men, the officers found a variety of articles of clothing which matched the clothing description provided by Jeffers. Although neither robber was wearing a certain distinctive T-shirt described by Jeffers, that T-shirt was recovered by the police in the immediate area. The officers also found Jeffers' wallet, the contents of which—including a credit card,

---

both appellants on this issue, Gause does not directly contest the government's claim of untimeliness, but he claims that "[i]n failing to raise any objection to the discovery request before the trial court—in either a written response to Mr. Gause's motion, an oral objection to the trial court, or a simple request for more time to respond to the request—the government waived the arguments it now advances, and its claims should not be heard."

Gause's claim of waiver is unpersuasive. In effect, Gause is seeking to "take advantage of his own wrong." *Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. 231, 232, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959); *Marboah v. Ackerman,* 877 A.2d 1052, 1053 (D.C.2005). The Jury Motion was complex and voluminous, and filing it so late made it virtually impossible for the government to respond to the motion prior to trial. When the case was called on October 17, the judge denied the motion on the merits—for failure to make out a *prima*

*facie* case—without according the prosecutor an opportunity to be heard. If the judge had not ruled as he did without awaiting a response from the prosecutor, the government could have challenged the motion as untimely, and might very well have done so. Given the sequence of events, the prosecutor had no reason to oppose a motion that had already been denied, and the government's appellate brief represented its first realistic occasion to present a claim of untimeliness.

Be that as it may, however, appellate counsel for the government expressly disclaimed, at oral argument before this court, any contention that we should affirm the judgment upon the ground—different from the trial judge's—that the Jury Motion was untimely. Under the circumstances, and because any prospective prejudice to the government has obviously been affected by the passage of time, we do not decide that question.

a social security card, and other identification—were scattered on the ground nearby. The officers further recovered a sawed-off shotgun. Finally, in Gause's pocket, the police found the victim's "lucky" two dollar bill. At a show-up shortly after the robbers' apprehension, Jeffers positively identified Wilkey as "the guy in my face" at the time of the robbery, and he said that Gause "looked like" the other robber, although he was wearing different clothes. Jeffers then stated: "But you know, I'm pretty sure he [Gause] is the guy . . . that picked up my money."[2]

A few days after the robbery, while both Wilkey and Gause were being detained in jail pending trial, Jeffers called the police and reported that, while he was in his car and stopped at a traffic light, he saw the two men who had robbed him walk in front of his vehicle. He said that one of the men pointed at him and that he (Jeffers) felt threatened. A defense investigator testified that he visited Jeffers at his home for 2½ hours, and that Jeffers signed a statement in which he expressed certainty that the two men who walked in front of his car were the robbers. Although this denouement put the government in the unusual position of arguing that a complainant's identification at a supposed second (or really third) sighting was *un*reliable, the jury found both defendants guilty of all charges. Each man was sentenced to serve a substantial prison term. These consolidated appeals followed.

## II.

## LEGAL ANALYSIS

### A. *Standard of review.*

The principal question presented in these appeals is whether the trial judge correctly denied appellants' Jury Motion and their request for discovery because, in the judge's view, Gause had failed to present, in support of his motion, a *prima facie* case of a violation of the Constitution or of the DCJSA. Although many discovery issues are confided to the trial court's sound discretion, *see, e.g., Beaner v. United States,* 845 A.2d 525, 536 (D.C.2004); *Gibson v. United States,* 566 A.2d 473, 478 (D.C.1989) (citations omitted), the dispositive question here-the standard under which that court should determine whether the appellants were entitled to discovery of the requested jury materials—is one of law, and we review the trial judge's decision *de novo.*

### B. *The Jury Motion.*

In his Jury Motion, Gause (subsequently joined by Wilkey) claimed that the Superior Court system for selecting juries "produces jury venires that do not reflect a fair cross-section of the community and systematically excludes African Americans," in violation of the Fifth and Sixth Amendments and the DCJSA. In support of his motion, Gause filed, *inter alia,* an affidavit by Richard Seltzer, a Professor of Political Science at Howard University who specializes in statistical analysis of jury composition. Based on the data available to him, including information regarding venires in several other cases, Dr. Seltzer stated that the average percentage of black jurors in the Superior Court venires observed by him and his investigators on Mondays was 52.2%, and that in one Monday case[3] the percentage of black jurors was only 22.8%. According to Dr. Seltzer, the general pop-

---

**2.** The robbery was also captured on the bank's surveillance cameras, and a videotape and still photos made from the videotape were admitted into evidence at the trial.

**3.** *United States v. Gooden,* F6988–02.

ulation of the District was 60% black,[4] and the disparities that he found on Mondays—7.8% and 37.2%—were statistically significant. Based on his preliminary study, Dr. Seltzer concluded that some jury venires are not representative either of the community or of the jury wheel. He explained that he needed access to the jury records to determine whether these disparities were representative of Superior Court venires generally and to identify the source or sources of any disparities.

In further support of the Jury Motion, Gause presented observations made by Honorable Henry F. Greene, the presiding judge in the *Gooden* case. Judge Greene stated that he had been advised by two court officials familiar with jury selection procedures that it was the practice of the Juror Office to "let any juror who is summoned for jury service and for whom [the initially scheduled] date is inconvenient to reschedule at least once, without even having to get the approval of a judge.... [I]t has become the overwhelming choice of jurors who wish to reschedule to reschedule for Mondays." The judge was also informed that some socio-economic groups, apparently including professionals, a high percentage of whom were white, "have a higher rate of rescheduling than other jurors," which may have resulted in a racial disparity among the jurors reporting on Mondays.

In his motion, filed (as we have noted) six days before trial, with a weekend in between, see footnote 1, *supra*, Gause focused primarily on the alleged underrepresentation of black jurors on Mondays. He asked the trial judge to stay the trial, to set a hearing for the substantive jury motion, and to order the Clerk of the Superi-

or Court to provide to his counsel, for the preceding five years, or for whatever shorter period as to which the requested materials were available,

> (a) "all documents and computer tapes" relating to the master jury wheel,
>
> (b) "all documents and computer tapes" containing personal information about all persons summoned for jury service, and
>
> (c) "all documents relating to the development of the current jury system and plan"

Gause also requested the court to order the Clerk to make available for interview by his counsel

> all jury office officials and staff and the staff of any agency designated by the Jury Plan to provide names to the jury office for inclusion in the master jury wheel.

When the case was called for trial, the judge orally denied the Jury Motion without hearing from the government. Without objection, the judge treated the motion as having raised solely a claim concerning the racial makeup of jury panels on Mondays. Gause claimed that these panels were disproportionately white because "professionals, who tend to be white, ask to be deferred," and that they are then given Mondays to come back to court. The judge ruled that evidence as to Monday venires was not sufficient to demonstrate the existence of a problem with the jury selection process as a whole, and that in any event, the proffered statistical disparity did not establish a *prima facie* case of "substantial under-representation." Although Gause's attorney cited a number of federal authorities, including *Test v. Unit-*

---

4. For a thoughtful criticism of the 60% figure as it applies to jury selection, see Judge James Boasberg's instructive opinion (based, of course, on a different record) in *United States*

*v. Odell Powell,* 136 Daily Wash. L. Rptr. 2149 (Super.Ct.D.C.2008). In Judge Boasberg's view, the correct figure was "less than 56%."

*ed States,* 420 U.S. 28, 95 S.Ct. 749, 42 L.Ed.2d 786 (1975) and *United States v. Royal,* 100 F.3d 1019 (1st Cir.1996), for the proposition that Gause's right to inspect the records was "unqualified" and that no showing of likelihood of success was required, the judge discerned a difference between *"prima facie* case and likelihood of success," and he explained that "I'm ruling on *prima facie* case. You haven't made it out." Because the judge denied the Jury Motion on the merits, the request for discovery in support of that motion became moot.

On the day (a Tuesday) following the judge's denial of the Jury Motion, fourteen jurors were selected, two of whom were to serve as alternates. Eight of the fourteen (57.1%) were black; six of them (42.9%) were white. The percentage of black persons on the jury was thus slightly above the percentage of black adult citizens of the District (less than 56%, as estimated by Judge Boasberg in his opinion in the *Powell* case.)

**C. *Substantive legal principles.***

In challenging the composition of the jury pool from which their petit jury was ultimately selected, appellants invoke their rights under the Sixth Amendment, the Fifth Amendment, and the DCJSA. Before addressing the appellants' claimed right to discovery which is at issue in these appeals, we briefly outline the substantive principles which provide context for this dispute.

" '[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial.' " *Diggs v. United States,* 906 A.2d 290, 296 (D.C.2006) (quoting *Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)). "[T]he jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor,* 419 U.S. at 538, 95 S.Ct. 692. However, the requirement of a fair cross-section does not extend to the composition of individual juries. *Id.* at 538, 95 S.Ct. 692; *see also Diggs,* 906 A.2d at 296.[5]

To establish "substantial underrepresentation that violates the Fifth Amendment, the defendant must show that (1) the underrepresented group is an identifiable, distinct class; (2) the group has been substantially underrepresented on juries in relation to its representation in the population; and (3) the jury system at question is susceptible of abuse or not racially neutral.' " *Obregon v. United States,* 423 A.2d 200, 207 (D.C.1980) (quoting *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977)). "Although the test appears to be very similar to the fair cross-section test [under the Sixth Amendment], there is one critical difference: in an equal protection challenge, the defendant must present evidence of a discriminatory intent." *Id.* (cit-

---

**5.** "[T]o establish a *prima facie* violation of the [constitutional] fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' " *Diggs,* 906 A.2d at 296 (quoting *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)). If a *prima facie* showing is made, the government may justify its jury selection procedures "by demonstrating that they clearly advance 'a significant state interest.' " *Carle v. United States,* 705 A.2d 682, 685 (D.C.1998) (quoting *Duren,* 439 U.S. at 367, 99 S.Ct. 664).

ing *Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. 664). "[O]nce the defendant has made out a *prima facie* case, the government bears the burden of showing that 'racially neutral selection criteria have produced' the unequal representation." *Id.* (citations omitted).

These constitutional protections are supplemented by statutory enactments, both at the federal level and in the District of Columbia. Prior to 1986, federal law provided for a "single jury selection system" for the federal and District of Columbia courts, namely, the Federal Jury Selection and Service Act (FJSSA), 28 U.S.C. §§ 1861 *et seq.* In 1986, Congress enacted the DCJSA, D.C.Code §§ 11–1901 *et seq.,* "to provide for the establishment of an independent jury system for the District of Columbia Superior Court." *See* S.Rep. No. 99–473, at 1 (1986).

The stated purposes of the FJSSA and the DCJSA are very similar. Both statutes protect the right to a jury that is chosen from a fair cross-section of the community, *compare* 28 U.S.C. § 1861 *with* D.C.Code § 11–1901, and a jury selection process that is free from unlawful discrimination. *Compare* 28 U.S.C. § 1862 *with* D.C.Code § 11–1903. The government acknowledges, and we agree, that to the extent that the purposes of the two statutes are similar, decisions construing the FJSSA offer useful guidance in interpreting the District's statute.

The purpose of the FJSSA (and, by analogy, of the DCJSA) is " 'to assure . . . that potential jurors will be selected at random from a representative cross section of the community and that all qualified citizens will have the opportunity to be considered for jury service.' " *Obregon,* 423 A.2d at 208 (quoting H.R.Rep. No. 90–1076, at 3 (1968)). The FJSSA requires courts "to establish plans for a jury selection system that does not discriminate

against potential jurors on the basis of race, color, religion, sex, national origin, or economic status, and that utilizes source lists representing a fair cross section of the community." *Id.*

D. *Statutory provisions authorizing challenges to compliance with selection procedures.*

Both the DCJSA and FJSSA contain provisions for objecting to the composition of juries and jury venires. The District's statute, under the heading of "Challenging Compliance with Selection Procedures," provides:

A party may challenge the composition of a jury by a motion for appropriate relief. A challenge shall be brought and decided before any individual juror is examined, unless the Court orders otherwise. The motion shall be in writing, supported by affidavit, and shall specify the facts constituting the grounds for the challenge. If the Court so determines, the motion may be decided on the basis of the affidavits filed with the challenge. If the Court orders trial of the challenge, witnesses may be examined on oath by the Court and may be so examined by either party.

D.C.Code § 11–1910(a).

The corresponding federal statute, 28 U.S.C. § 1867, which has an identical heading, is organized somewhat differently, and it is considerably more detailed. The FJSSA states that, in criminal cases, within specified time limits, "the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury." 28 U.S.C. § 1867(a). It further provides that upon the filing of such a motion,

the moving party shall be entitled to present in support of such motion the

testimony of the jury commission[er] or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence 28 U.S.C. § 1867(d). In other words, the statute affirmatively contemplates that information and records relating to jury selection, not otherwise available to the general public, may be presented in support of a motion challenging jury selection procedures. The DCJSA provides, somewhat analogously, that the contents of any records or lists used in connection with the selection process "shall not be disclosed, *except in connection with the preparation or presentation of a motion under § 11–1910*, or until all individuals selected to serve as grand or petit jurors from such lists have been discharged." D.C.Code § 11–1914(b) (emphasis added). Thus, in the District, as under federal law, it is contemplated that a defendant who makes or prepares a motion directed at the juror selection process may, at least under some circumstances, have access to records not otherwise available to the public at large.

Finally, the federal statute contains a provision that relates directly to the kind of discovery sought by appellants in the present case:

> *The parties in a case shall be allowed to inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of such a motion.*

28 U.S.C. § 1867(f) (emphasis added). There is no corresponding provision in the DCJSA. Thus, the law applicable to the District prior to 1986 expressly provided an unqualified right to inspect and copy such documents even before a Jury Motion has been filed. The DCJSA does not provide such a right, at least explicitly.

### E. *Case law under the FJSSA.*

In their comprehensive briefs, the parties have cited no decisions, and we are aware of none, addressing the standard under the DCJSA for determining whether a criminal defendant who seeks to challenge the jury pool or venire from which his or her jury was selected is entitled to pre-motion discovery, and, if so, the scope of such discovery. Appellants rely on the case law that has been developed under the FJSSA, and they assert that the federal precedents apply with equal force to proceedings in the Superior Court. We first discuss the federal case law and then turn to the question—not an easy one—whether that case law applies by analogy to the appeals presently before us.

The leading authority construing the federal statute is *Test v. United States,* 420 U.S. 28, 95 S.Ct. 749, 42 L.Ed.2d 786 (1975) (per curiam). John E. Test, who had been charged with distribution of LSD, filed a Jury Motion in which he claimed that the master lists from which his grand jury had been selected, and from which his petit jury would be chosen, disproportionally excluded blacks, Latinos, and students. In support of his motion, he filed an affidavit by his counsel regarding testimony in another case which, according to Test, supported his challenge. Test requested leave to copy the jury lists "pertaining to grand and petit juries in the instant indictment." The District Court denied both the motion and Test's request to copy the relevant documents. Test was convicted, and the Court of Appeals affirmed his conviction without perceiving any need to address the jury selection issue. *United States v. Test,* 486 F.2d 922 (10th Cir.1973).[6] The Supreme Court

---

6. The Court of Appeals stated only that "[w]e have closely examined appellant's other contentions and find no merit in them." 486 F.2d at 926.

granted *certiorari,* however, and before that Court, the United States "agreed that [Test] was erroneously denied access to the lists," 420 U.S. at 29, 95 S.Ct. 749. The government urged that the case be remanded with appropriate instructions. The Supreme Court, in a terse per curiam opinion addressing what turned out to be an uncontested issue, likewise agreed with the appellant. After quoting 28 U.S.C. § 1867(f), which provides that "[t]he parties in a case shall be allowed to inspect, reproduce and copy such records or papers [pertinent to a challenge to the court's jury selection procedures] at all reasonable times during the preparation and pendency of such a motion," the Court stated:

> This provision makes [it] clear that a litigant has essentially an unqualified right to inspect jury lists. It grants access in order to aid parties in the 'preparation' of motions challenging jury-selection procedures. Indeed, without inspection, a party almost invariably would be unable to determine whether he has a potentially meritorious jury challenge. *Thus, an unqualified right to inspection is required not only by the plain text of the statute, but also by the statute's overall purpose of insuring 'grand and petit juries selected at random from a fair cross-section of the community.'* 28 U.S.C. § 1861.

*Id.* at 30, 95 S.Ct. 749 (emphasis added; footnote omitted). The Court further held that it was unnecessary to determine whether the affidavit by Test's attorney in support of his motion had "established a *prima facie* case of jury exclusion thereby entitling him to inspection under 28 U.S.C. § 1867(d)," for Test had "an unqualified right to inspect under § 1867(f)." *Id.* at 29–30 n. 2, 95 S.Ct. 749.

The federal appellate courts have faithfully followed the Supreme Court's decision in *Test.* Most recently, in *United States v. Stanko,* 528 F.3d 581 (8th Cir. 2008), the court stated:

> The Supreme Court has explained that under section 1867(f), "a litigant has essentially an *unqualified* right to inspect jury lists." *Test v. United States,* 420 U.S. 28, 30, 95 S.Ct. 749, 42 L.Ed.2d 786 (1975). "To avail himself [or herself] of [the] right of access to otherwise unpublic jury selection records, a litigant need only allege that he [or she] is preparing a motion challenging the jury selection procedures." *United States v. Alden,* 776 F.2d 771, 773 (8th Cir.1985) (alteration in original) (quoting *United States v. Layton,* 519 F.Supp. 946, 958 (N.D.Cal.1981)). A defendant may not be denied this unqualified right even when he "fails to allege facts which show a 'probability of merit in the proposed jury challenge,'" *id.* at 774 (quoting *United States v. Beaty,* 465 F.2d 1376, 1380 (9th Cir.1972)), because "[g]rounds for challenges to the jury selection process may only become apparent after an examination of the records." *Id.* at 775. A fair reading of Stanko's motions shows that he was questioning the composition of the grand and petit juries and was seeking information he believed was necessary to challenge the jury selection process.

*Id.* at 587 (emphasis in original). The court went on to hold that the District Court erred in denying Stanko's request to review grand jury and petit jury records when it ruled against Stanko on the basis of a lack of showing of "particularized need," for no such showing was required. *Id. See also, e.g., United States v. Royal,* 100 F.3d 1019, 1024–25 (1st Cir.1996) (containing lucid explanation of the holding in *Test* ); *Gov't of Canal Zone v. Davis,* 592 F.2d 887, 889 (5th Cir.1979) ("Since the appellants' right to inspection was unqualified, whether or not the accompanying affidavit established a *prima facie* case of [a]

defective jury selection process is of no import") (citing *Test* ).

Under the federal case law, while the *right* to inspection is unqualified, the scope of that right is not unlimited with respect to the materials sought to be made available or inspected. *See, e.g., United States v. Miller,* 116 F.3d 641, 658 (2d Cir.1997) (defendant has right of access "only to records and papers already in existence [;][w]e see nothing that entitles defendants to require the jury administrator to analyze data on their behalf"); *United States v. Curry,* 993 F.2d 43, 44 (4th Cir.1993) (Section 1867(f) "did not entitle [defendant] to juror qualification questionnaires without some demonstration of necessity") (citation omitted). The relevant authorities are summarized in *United States v. Rice,* 489 F.Supp.2d 1312, 1316–17 (S.D.Ala.2007):

> Despite recognizing defendants' near-absolute right to inspect jury lists under *Test,* federal courts have uniformly declined to allow unfettered access to all jury-related documents and records. *See, e.g., [United States v.] Diaz,* 236 F.R.D. [470,] 482 [ (N.D.Cal.2006) ] ("The right to discovery [authorized] by the Act and *Test* is not limitless."); *United States v. Carlock,* 606 F.Supp. 491, 493 (E.D.La.1985) ("the right of access involved here is not without limitations"); *United States v. Gotti,* 2004 WL 2274712, *6 (S.D.N.Y. Oct.7, 2004) ("*Gotti II* ") (defendant making § 1867(f) request "is not entitled to unencumbered access to juror information"); *United States v. Causey,* 2004 WL 1243912, *9, *18 (S.D.Tex. May 25, 2004) (collecting cases for proposition that while a criminal defendant has an

essentially unqualified right to inspect master list from which members of his grand and/or petit jury were selected, access to other jury records can be restricted); *United States v. Gotti,* 2004 WL 32858, *11 (S.D.N.Y. Jan.6, 2004) ("*Gotti I* ") ("Moving defendants do not have an absolute right of access to all materials relating to the grand jury selection...."). The Act is not a license for litigants to rummage at will through all jury-related records maintained by the Clerk of Court. Indeed, as one appellate court has explained, § 1867(f) "provides that the contents of records or papers used by the clerk shall not be disclosed unless those records' contents are shown to be 'necessary' [7] for the preparation of a motion" alleging substantial failure to comply with the Act. *United States v. Davenport,* 824 F.2d 1511, 1515 (7th Cir.1987); *see also Diaz,* 236 F.R.D. at 482 ("While a defendant has a statutory right to data required for a proper assessment of the composition of the panel, the [Act] does not automatically permit disclosure of other jury information" without a sworn statement showing particularized need). Under that reasoning, then, if certain records or papers are not reasonably necessary for preparation of a motion under the Act, then the Act does not authorize access to those records or papers.

### F. Applicability vel non of the federal case law to the DCJSA.

Pointing (correctly) to significant similarities between the FJSSA and DCJSA in

---

7. In this respect, the DCJSA is arguably broader than its federal counterpart. It provides that jury records or lists used in the selection process shall not be disclosed *"except in connection* with the preparation or

presentation of a motion under § 11–1910...." D.C.Code § 11–1914(b) (emphasis added). A showing of necessity is not required.

relation to their purpose and structure,[8] appellants contend that *Test* and its progeny apply with full force to discovery under the DCJSA. Noting that the FJSSA applied to the District prior to the adoption of the DCJSA, *see Kingsbury v. United States,* 520 A.2d 686, 688 (D.C.1987), appellants claim that although the new legislation was designed to transfer administrative authority over local juries from the United States District Court to the Superior Court, the substance of the statute's protections remained the same. According to appellants, "[t]he new legislation retained the purpose and structure of the [FJSSA] as well as much of its language, *and the same unqualified right to inspect jury records* that the Supreme Court discerned in the purpose and language of the FJSSA inheres in the purpose and language of [the District's] Jury System Act." (Emphasis added.) Appellants go on to argue that "[w]hen a single legislative body borrows language from its own previous legislation and uses that language in a new statute *without alteration,* it is presumed to have adopted any settled judicial interpretations of the language existing at the time of the subsequent legislation." (Emphasis added; citations omitted.)

Although we have no quarrel with the canon of construction urged upon us by appellants, we question whether that canon can fairly be applied to the issue presented to us here. The "unqualified" right to inspect jury records under the FJSSA was explicitly articulated in 28 U.S.C. § 1867(f), which, as we have seen, provides that "[t]he parties in a case shall be allowed to inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of such a motion." Strikingly, for purposes of the present appeals, neither this provision nor anything that could fairly be characterized as its equivalent appears in the DCJSA.

■ Congress presumably had some reason for not retaining the language in § 1867(f) when it enacted the DCJSA. As we explained in *United States v. Brown,* 422 A.2d 1281, 1284 (D.C.1980) (citations omitted), "a change in legislative language gives rise to a presumption that a change was intended in legislative result." *Accord, Covington v. United States,* 698 A.2d 1033, 1037 n. 6 (D.C.1997) (quoting *Brown* ). "Where the words of a later statute differ from those of a previous one on the same or [a] related subject, the Congress must have intended them to have a different meaning." *United States v. Wilson,* 351 U.S.App. D.C. 261, 274, 290 F.3d 347, 360, *cert. denied,* 537 U.S. 1028, 123 S.Ct. 581, 154 L.Ed.2d 442 (2002) (internal quotation marks omitted) (quoting *Muscogee (Creek) Nation v. Hodel,* 271 U.S.App. D.C. 212, 217, 851 F.2d 1439, 1444 (1988), *cert. denied,* 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989)); *see also Klein v. Republic Steel Corp.,* 435 F.2d 762, 765–66 (3rd Cir.1970). "If words used in a prior statute to express a certain meaning are omitted, it will be presumed that a change of meaning was intended." *Chertkof v. United States,* 676 F.2d 984, 988 (4th Cir.1982) (quoting 2A C. Dallas Sands, Sutherland Statutory Construction § 51.02 (1973)). " '[W]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a differ-

---

8. The purposes and policies underlying the two statutes are very similar. *Compare* D.C.Code §§ 11–901 & –11–903 *with* 28 U.S.C. §§ 1861 to 1862. Both statutes permit challenges to jury selection procedures by motion, and contemplate the disclosure of jury records in connection with such a challenge. *Compare* D.C.Code § 11–1910(a) and (b) with 28 U.S.C. § 1867(a) and (d).

ent intention existed.'" *Water Quality Ass'n Employees' Benefit Corp. v. United States*, 795 F.2d 1303, 1307–08 (7th Cir. 1986) (quoting 2A Sutherland Statutory Construction § 51.02 (4th ed.1984)). Although the foregoing authorities are based on a canon of construction, rather than an inflexible rule of law, *see Covington*, 698 A.2d at 1037 n. 6, it is surely significant that in this instance, Congress did not merely change statutory language, but in fact omitted from the statute applicable to the District the very provision that created the "unqualified" right to inspect jury records even prior to the filing of a motion alleging constitutional or statutory deficiencies in the juror selection process.[9]

This, however, does not end our inquiry. In *Test*, the Supreme Court did not rely solely on the language of § 1867(f). Rather, the Court stated that an unqualified right to inspect is required "not only by the plain text of the statute, but also by the statute's overall purpose of insuring grand and petit juries selected at random from a fair cross section of the community." *Test*, 420 U.S. at 30, 95 S.Ct. 749 (quoting 28 U.S.C. § 1861) (internal quotation marks omitted). That conclusion was premised on the Court's observation that "without inspection, a party almost invariably would be unable to determine whether he has a potentially meritorious jury challenge." *Id.* From this, appellants argue that they have an unqualified right to inspect the records notwithstanding the omission from the DCJSA of an analogue to § 1867(f).

This contention by appellants raises a difficult question, with respect to which reasonable people may well differ. In our view, however, the Supreme Court's forceful language should be read in the context of the circumstances before it. The Court was writing about an issue with respect to which there was no dispute between the parties; the government and the appellant agreed that the trial judge had erred in refusing to make the records available. We are not persuaded that the Court would have made the same observations about what was required by the "overall purpose" of the statute if it had been confronting, as we are, the effect of a new enactment from which the provision principally relied upon had been omitted. In *Khiem v. United States*, 612 A.2d 160 (D.C.1992), *cert. denied*, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993), we explained:

> In *Kraft v. Kraft*, 155 A.2d 910 (D.C. 1959), the court pointed out that:
>
>> It is well to remember that significance is given to broad and general statements of the law only by comparing the facts from which they arise with those facts to which they supposedly apply.
>
> 155 A.2d at 913. *See also Armour & Co. v. Wantock*, 323 U.S. 126, 132–33, 65 S.Ct. 165, 89 L.Ed. 118 (1944), where the Supreme Court aptly stated:
>
>> It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the order under discussion. *To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court.* General

---

9. Our dissenting colleague describes the federal and District of Columbia statutes as "remarkably similar—indeed, almost identical." In our view, however, she fails to come to grips with the proposition, supported by the authorities cited in the text, that by changing the language of the FJSSA (*i.e.*, by omitting any counterpart to § 1867(f)), Congress must have intended a change in meaning.

expressions transposed to other facts are often misleading.

*Id.* at 164 (emphasis added in *Khiem*). Accordingly, we conclude that the question whether a criminal defendant in the District has the same unqualified right as his federal counterpart to inspect jury records, without being required to make any prior showing at all, is a question of first impression in this jurisdiction with no binding authority constraining our resolution of it.

Finally, to the extent that the decision in *Test* rests on the Supreme Court's belief that without unqualified pre-motion access to non-public materials, a party could not determine whether he or she has a meritorious jury challenge, that situation does not presently exist in the District of Columbia. *See infra* note 14 and associated text. Although the issue is by no means free of difficulty, we do not believe that *Test* and its progeny stand for the proposition that an "unqualified right," enforceable prior to the filing of a Jury Motion, would have survived the repeal of § 1867(f), or that, under present circumstances, the Constitution requires that criminal defendants in our Superior Court have an essentially unqualified right to inspect non-public jury records.

## G. *The standard in the District.*

We now turn to the showing, if any, that Gause and Wilkey must make in order to secure the right to inspect and copy non-public records relevant to Gause's jury motion. We note first that the highest court of our neighboring jurisdiction of Maryland has adopted the "unqualified right" standard articulated by the Supreme Court in *Test. See Lewis v. State,* 332 Md. 639, 632 A.2d 1175 (1993). The question before the court in *Lewis,* however, was not a difficult one, for Maryland has a statute—Courts and Judicial Proceedings Article § 8–212(b)—which is, for all practical purposes, identical to 28 U.S.C. § 1867(f). *Id.* at 1177. Rejecting the State's argument that a defendant must make a *prima facie* case showing a defect in the jury selection system, the court stated:

> The plain language of § 8–212(b) is dispositive. That subsection confers a right of pre-motion inspection.... The language employed in § 8–212(b) is inconsistent with the State's position. Had the General Assembly intended the sequence for which the State contends, the last sentence of § 8–212(b) should have provided, in effect, that the parties may inspect "during the pendency of the motion and in preparation for the hearing thereon."

*Id.* at 1178.

■ A different result has been reached, however, in jurisdictions in which there was no equivalent of 28 U.S.C. § 1867(f). In California, although a defendant is not required to present a *prima facie* case of underrepresentation of a distinctive group to obtain discovery of non-public jury information, he or she must make "a particularized showing supporting a reasonable belief that underrepresentation in the jury pool or the venire exits as the result of practices of systematic exclusion." *People v. Jackson,* 13 Cal.4th 1164, 56 Cal.Rptr.2d 49, 920 P.2d 1254, 1268 (1996); *see also Roddy v. Superior Court of San Diego County,* 151 Cal.App.4th 1115, 60 Cal.Rptr.3d 307, 322 (2007) (quoting *Jackson* ). In *Jackson,* the court stated in pertinent part:

> Here we consider not whether defendant has made a *prima facie* case, but the prior question of whether defendant was wrongly denied the discovery of information necessary to make such a case. A defendant who seeks access to this information is obviously not required to justify that request by making a *prima facie* case of underrepresentation.

Rather, upon a particularized showing supporting a reasonable belief that underrepresentation in the jury pool or the venire exists as the result of practices of systematic exclusion, the court must make a reasonable effort to accommodate the defendant's relevant requests for information designed to verify the existence of such underrepresentation and document its nature and extent.

*Id.* at 1268. Similarly, in a decision which predated *Test,* the Supreme Court of Florida required a defendant seeking such discovery to make a showing of "facts sufficient to raise a suspicion that the . . . jury pool was improperly constituted." *Rojas v. State,* 288 So.2d 234, 236 (Fla.1973).

■ As we understand these decisions, the burden on the defendant is not a demanding one. It appears to be roughly comparable to the reasonable "articulable suspicion" standard applied by the Supreme Court (albeit in the entirely different context of "stop and frisk") in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and the approach we adopt is not intended to be more demanding than that in *Terry.* Indeed, as the court noted in *Jackson,* the use of a "merits" standard as a precondition for discovery is premature and illogical. The government agrees that a *"prima facie* case" approach is too exacting and unwarranted. In our view, however, the "reasonable belief" standard adopted by the Supreme Court of California in *Jackson,* with doubtful cases to be resolved in the defendant's favor with respect to access to discovery, is appropriate for the District of Columbia and well-suited to the circumstances of this jurisdiction.[10]

■ It is a matter of common knowledge that the Superior Court is an extremely busy urban court. We take judicial notice that its criminal caseload is substantially greater than that of a United States District Court.[11] In her testimony in support of the adoption of the DCJSA, former Corporation Counsel Inez Smith Reid (now an Associate Judge of this

10. Judge Blackburne–Rigsby argues that by adopting the "reasonable belief" standard, we are contravening the "plain language" rule and engrafting upon the the DCJSA a requirement that is not there. We do not agree.

The records in question here are not available to members of the general public. Under the federal statute, the appellants' status as criminal defendants, standing alone, is sufficient to provide them with rights of access not conferred upon other citizens. By the plain language of the FJSSA, Gause and Wilkey would be "allowed to inspect, reproduce and copy such records...." 28 U.S.C. § 1867(f). The DCJSA, however, contains no such provision, and it is therefore the responsibility of the court to adopt an appropriate standard which would differentiate the appellants from other members of the public. There is nothing in the local statute, as distinguished from its federal counterpart, which provides to criminal defendants automatic access to otherwise non-public records. It is for this reason that we have adopted (not added) a standard which is essentially the same as that utilized by the courts of California and

Florida. There is nothing in the text or purpose of the DCJSA that is inconsistent with this standard.

Our dissenting colleague also relies on D.C.Code § 11–1914 (2001), entitled "Preservation of records." Section 11–1914(b) provides that the contents of jury selection documents shall not be disclosed unless the jurors have been discharged, or alternatively, "in connection with the preparation or presentation of a motion under § 11–1910." This provision authorizes disclosure of otherwise non-public records, but it does not purport to prescribe a standard governing such disclosure, nor does it state or even suggest that no showing need be made. Indeed, in our view, the very title of the provision is inconsistent with the meaning that our colleague seeks to attribute to it.

11. In calendar year 2007, 437 jury trials were held in the Criminal Division of the Superior Court. DISTRICT OF COLUMBIA COURTS, 2007 STATISTICAL SURVEY 13 (2007). By contrast, during the twelve-month period ending September 30, 2007, there were 37 criminal jury trials in

court) stated that "the Federal system is inadequate to service the demands of the Superior Court's heavier jury trial caseload and use of larger juries." *To Establish an Independent Jury System for the District of Columbia: Hearing on H.R. 2717 and H.R. 2946 Before the Subcomm. on Judiciary and Education and the H. Comm. on the District of Columbia,* 99th Cong. 34 (1985). As the Supreme Court of Florida has explained, to provide the defendant in every jury-triable case the right to conduct an unrestricted investigation, without "so much as an affidavit based upon information and belief, that the panel was improperly drawn," would amount to a "fishing expedition of broad range." *Rojas,* 288 So.2d at 237. Indeed, the court wrote,

> [s]uch a course would consume enormous amounts of time and energy of our already overburdened trial courts, with concomitant delays in their calendars, and would be especially injurious to the prompt disposition of justice.

*Id.*

In the District of Columbia, it is no longer impossible for a defendant's attorney to determine, without an unqualified right of inspection before a Jury Motion is filed, whether there is reason to believe that the juror selection system is in contravention of constitutional or statutory requirements. In the present case, for example, Gause's counsel moved the court, shortly before oral argument, to "supplement the record" with information from the *Odell Powell* case, in which the defendant made a claim similar to those presented by appellants in this case. A few days after oral argument of the present appeals, Judge Boasberg issued a comprehensive opinion in which he discussed, in considerable detail, jury selection practices in the District, as well as their racial consequences.[12] The Public Defender Service represents defendants both in *Powell* and in *Gause,* and it is surely a resource available to other defense counsel in cases of this kind.[13] If there is in fact reason to believe that constitutional or statutory violations have occurred,[14] it should not be unduly difficult for a competent attorney to satisfy the relatively modest standard set forth herein.

If, on the other hand, a defendant in an urban jurisdiction such as ours were per-

---

the United States District Court for the District of Columbia. Administrative Office of the U.S. Courts, James C. Duff, Judicial Business of the United States Courts: 2007 Annual Report of the Director (Table T–1).

**12.** Gause withdrew his motion to supplement the record after Judge Boasberg issued his decision, but he recognized that we may take judicial notice of the decision in *Odell Powell* and of the proceedings therein.

**13.** The Public Defender Service "may furnish technical and other assistance to private attorneys (who have been) appointed to represent" [criminal defendants pursuant to the Criminal Justice Act]. D.C.Code § 2–1602(a)(2) (2001).

**14.** In *Odell Powell,* however, Judge Boasberg concluded his opinion, based on the record in that case, as follows:

> All citizens of the District of Columbia should desire a jury-selection system that produces juries that are representative of our community. Indeed, both the Constitution and our own law require as much. The system employed at the Superior Court is not a perfect one; in fact, diligent staff at the Jury Office have recently implemented certain improvements, and a new computer system will further enhance its operations. Yet imperfect and unconstitutional are hardly synonymous. The data uncovered in this litigation conclusively prove that black jurors are not unconstitutionally underrepresented in Superior Court venires—in fact, they are overrepresented in summonses issued—and there is also no systematic exclusion of black jurors. As a result, Defendant's Motion is DENIED.

mitted (as Gause has sought) to examine records going back five years, to interview and depose court officials, without any kind of pre-motion showing at all, then there may be no sound reason for counsel to refrain from demanding such discovery in any case triable by a jury. Counsel could request a voucher for an expert witness at taxpayer expense; a trial judge's refusal to authorize an expert might plausibly be challenged on appeal. Where an attorney has not submitted a voucher, or has failed to file a Jury Motion or a request to inspect juror selection records, this could arguably constitute non-frivolous grounds for a post-conviction claim of ineffective assistance of counsel. To provide these kinds of perverse incentives to counsel to make such requests and demands, with no requirement of any showing at all that unlawful discrimination may have occurred, is not required by the Constitution or by our statute, and in our view, such a regime would not be in the interests of justice.[15]

We recognize that the elimination of racial and other unlawful discrimination is a policy to which our nation, and this capital city, have accorded the "highest priority." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Harris v. District of Columbia Comm'n on Human Rights*, 562 A.2d 625, 626 (D.C.1989). This is especially important with respect to our justice system. Indeed,

> [d]iscrimination on the basis of race, odious in all respects, is especially perni-

cious in the administration of justice. Selection of members of a grand jury [or petit jury] because they are of one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process. The exclusion from grand jury service [or jury service] of . . . any group otherwise qualified to serve, impairs the confidence of the public in the administration of justice. As this Court repeatedly has emphasized, such discrimination 'not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government. *Smith v. Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940) (footnote omitted).

*Rose v. Mitchell*, 443 U.S. 545, 555–56, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979).

■ Where there is evidence—or at least some reason to believe—that prohibited discrimination may have occurred, considerations of cost are secondary. But where the defendant cannot make even the modest showing required by *Jackson* and adopted in this opinion, a "fishing expedition," *Rojas*, 288 So.2d at 237, cannot and should not be countenanced.[16]

## H. Standing.

The government claims that appellants lack standing to contest the substantive issues raised in their Jury Motion because the affidavit and other papers filed in sup-

---

**15.** This is not to say that baseless requests of this kind would necessarily abound; any assertion to that effect would necessarily be speculative. Nevertheless, we should not facilitate groundless filings, based on hope rather than on evidence, in the absence of a constitutional or statutory basis for doing so.

**16.** Should the trial court determine, on remand, that appellants have made the requisite

showing of reason to believe, the question may arise as to the scope of discovery available to them. We will not prematurely address issues that may or may not arise. *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 182 (D.C.1993). We invite counsel's attention, however, to the approach adopted by the federal courts. See Part II E of this opinion.

port of the motion tended to show racial disparities, if at all, only on Mondays, and the jury that convicted appellants was selected on a Tuesday. The government's theory would be altogether academic if the question arose in a federal court, for under the regime of *Test*, appellants would have an unrestricted right to inspect and copy the records, without any evidence or suspicion of discrimination on any day of the week. Although we have concluded that, in this jurisdiction, access to the records is available to a defendant only if there is reason to believe that there has been a constitutional or statutory violation, we conclude that the "Monday–Tuesday" issue is best addressed by making it a part of the "reason to believe" inquiry. What happens on Mondays may or may not shed light on what occurs on other days of the week.

## III.

## CONCLUSION

For the foregoing reasons, the case is remanded to the trial court for a determination whether appellants have demonstrated a reason to believe that the selection of appellants' jury violated the Fifth or Sixth Amendments or the DCJSA. If the trial judge determines that such reason to believe exists, then he shall grant appellants' request for discovery in conformity with this opinion, and he shall thereafter set a hearing for, and shall rule upon the merits of, the appellants' Jury Motion. If the judge determines that there is no reason to believe that a constitutional or statutory violation has occurred, then the appellants' request for discovery shall be denied. In reaching his decision, the trial judge may take judicial notice of the decision of Judge James E. Boasberg in *United States v. Odell Powell,* see footnote 4, *supra,* and of the proceedings in that case.

■ ■ ■ *So ordered.*[17]

BLACKBURNE–RIGSBY, Associate Judge, dissenting:

The majority decision imposes a greater burden on litigants who seek to challenge the fairness of their jury in D.C. Superior Court than is required in federal district court or by the District of Columbia Jury System Act ("DCJSA"). I agree that a

---

**17.** Wilkey's other contentions are without merit. The trial judge did not commit plain error, *see Thomas v. United States,* 914 A.2d 1, 8 (D.C.2006), by not taking unspecified remedial action regarding Wilkey's claim that a juror was sleeping. Essentially, the judge stated that he would keep an eye on the juror, and Wilkey's attorney did not move for a mistrial or request any other relief. *See also Golsun v. United States,* 592 A.2d 1054, 1056 (D.C.1991).

Wilkey is likewise not entitled to reversal on the basis of the judge's instruction to the jury regarding aiding and abetting. Wilkey did not object to the instruction, *see* Super. Ct. Crim. R. 30, and he has not shown that the instruction was plainly erroneous or, indeed, that it was erroneous at all. Specifically, the instruction did not contain the language which this court held to be erroneous in *Wilson–Bey v. United States,* 903 A.2d 818 (D.C.

2006) (en banc), *cert. denied,* —— U.S. ——, 127 S.Ct. 2248, 167 L.Ed.2d 1089 (2007). Moreover, the evidence showed that Wilkey was a principal, and not an aider or abettor.

Wilkey's claim that the evidence was insufficient to show that he lacked the necessary intent to commit armed robbery and the related weapons offenses is altogether unpersuasive. According to the complaining witness, Wilkey, who was armed with a shotgun, approached him at an ATM machine and demanded that the victim "give it up, Pops." The robbers took $20.00 from the victim's hand. Wilkey then fled with his confederate, and the police subsequently found both appellants hiding under some bushes with the fruits of the robbery, clothes worn during the robbery, and a loaded shotgun all located nearby. *See generally Lattimore v. United States,* 684 A.2d 357, 359 (D.C.1996).

remand is appropriate because the trial judge erroneously imposed a "prima facie" standard, which is not required by the DCJSA. However, I disagree with the majority's imposition of a different standard, which is also unnecessary under the DCJSA. Though the majority does not impose as stringent a standard as the trial judge, the majority attempts to fashion a standard that is not required by the language and purpose of the DCJSA. The DCJSA does not qualify a litigant's right to obtain certain jury information "in connection" with a challenge to the fairness of the jury. The majority has imposed the additional hurdle for litigants in D.C. Superior Court despite acknowledging that the purpose of both the DCJSA and the Federal Jury Selection and Service Act ("FJSSA") statutes are similar, if not identical. I disagree with the majority's imposition of the heightened "reasonable belief" requirement for motions brought under the DCJSA, because the additional requirement creates an unnecessary hurdle for litigants seeking discovery of jury pool information, which is vital to challenge the fairness of their jury pool. The plain language and the underlying purpose of the DCJSA do not support the imposition of this additional hurdle. Therefore, I respectfully dissent.

The sole requirement in the DCJSA for making a jury challenge is that the information sought is "in connection with" a motion made under the Act. As such, we should be guided by familiar canons of statutory interpretation that suggest that statutes clearly mean what they say.[1] Although the majority makes much of the absence of the "shall be allowed to inspect" language in the DCJSA, in light of its inclusion in section 1867(f) of the FJSSA, the majority does not adequately explain how the absence of that language must be read to undermine the recognized purpose of the FJSSA, which the majority notes is similar-if not identical-to the DCJSA. Nor does the majority point to any new language in the DCJSA that purports to "qualify" the right of litigants to challenge the fairness of the jury. The majority interprets the *absence* of certain language to indicate Congress's intent to accord less protection to litigants under the DCJSA than was accorded to litigants under the FJSSA, while simultaneously conceding that the DCJSA is arguably broader, in some respects, than its federal counterpart.

Nor does the majority explain why consistency of interpretation between a remarkably similar—indeed almost identical—federal statute and a District of Columbia statute would be undesirable, especially in light of our deference to and reliance upon federal cases interpreting analogous statutes.[2] This is particularly

---

1. *See, e.g., In re B.B.P.*, 753 A.2d 1019, 1021 (D.C.2000) (holding that "the plain meaning of the statute used ... is generally the best indication of legislative intent"); *United States v. Stokes*, 365 A.2d 615, 618 (D.C.1976) (holding that "in the absence of persuasive evidence to the contrary, we are not empowered to look beyond the plain meaning of the statute's language in construing legislative intent."); 2A NORMAN J. SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 46.06 at 135 (2000 ed.) ("What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will.").

2. *See, e.g., District of Columbia v. Craig*, 930 A.2d 946, 953 n. 7 (D.C.2007) (holding that this Court's prior decision interpreting and applying the federal Anti–Injunction Act were "persuasive when construing" the District's own similar statute despite lack in language uniformity between statutes); *Hively v. District of Columbia Dep't of Employment Servs.*, 681 A.2d 1158, 1162 (D.C.1996) (holding that despite a change in the statutory language, where a District statute replaced the federal Longshore and Harbor Workers' Compensation Act, the coverage area was not altered).

so given that this Court previously articulated that "[t]he government cannot rely on courts to rewrite imprecise enactments, and this is especially true where, as here, the [government] is asking us to accord a narrow and grudging construction to remedial legislation." *District of Columbia v. Tarlosky,* 675 A.2d 77, 80–81 (D.C.1996) (internal quotation marks omitted) (citing *Lanier v. District of Columbia,* 871 F.Supp. 20, 24 (D.D.C.1994)).

Furthermore, the Supreme Court held that pursuant to the FJSSA, defendants have an "unqualified" right to "jury selection records." *Test v. United States,* 420 U.S. 28, 30, 95 S.Ct. 749, 42 L.Ed.2d 786 (1975). The majority seizes upon the absence of certain language in the DCJSA as the primary basis for qualifying a litigant's rights under the DCJSA. The majority's analysis is flawed because in *Test* the Supreme Court did not look simply to the statutory language. The Court also accorded great weight to the purpose of the statute where it said, "an unqualified right to inspection is required not only by the plain text of the statute, but also by the statute's overall purpose of insuring that 'grand and petit juries [are] selected at random and from a broad cross section of the community.'" *Id.*

Additionally, *Test* has been interpreted by federal circuit courts to mean, at a minimum, that litigants seeking to challenge the fairness of their jury are entitled to source lists and master jury wheel information.[3] Federal case law, however, has made clear that while the right to inspect is unqualified, the scope of the right is not unlimited. *See, e.g., United States v. Miller,* 116 F.3d 641, 658 (2d. Cir.1997).[4] In evaluating a request for discovery under the FJSSA, federal circuit courts have examined each request for information beyond the source lists and master jury wheel separately—an approach that would also be advisable in Mr. Gause's circumstance.[5]

3. *See, e.g., United States v. Orlando–Figueroa,* 229 F.3d 33, 42 (1st Cir.2000) (holding that under FJSSA, a defendant need only convey intent to prepare a motion to challenge the jury selection process to obtain access to jury selection records); *United States v. Curry,* 993 F.2d 43, 44–45 (4th Cir.1993) (remanding to district court to permit inspection of master jury list); *United States v. Lawson,* 670 F.2d 923, 926 (10th Cir.1982) (remanding to district court to permit inspection of jury lists); *United States v. Beaty,* 465 F.2d 1376 (9th Cir.1972) (remanding to district court to permit inspection of master jury wheel and other records under FJSSA).

4. *See, e.g., United States v. Davenport,* 824 F.2d 1511, 1513–15 (7th Cir.1987) (holding that defendant had "unqualified right" to the jury list but not the juror qualification questionnaires without some demonstration of necessity); *United States v. McLernon,* 746 F.2d 1098, 1122–23 (6th Cir.1984) (holding that defendants' right to disclosure was satisfied by inspection of master lists and the relevant demographic data about the general pool from which the grand jurors were selected

and therefore, defendants were not entitled to the names, addresses, and demographics of the individual grand jurors who returned indictments against them).

5. The District of Columbia jury system plan provides for the random selection and service of grand and petit jurors in the Superior Court. D.C.Code § 11–1904 (2001). The plan provides that a master juror list is compiled from lists of District of Columbia voters, and names from other appropriate sources as identified in the jury system plan. D.C.Code § 11–1905 (2001). The plan then provides for procedures for the random selection and qualification of grand and petit jurors from the master juror list, which contains name, age, and occupation information *inter alia.* D.C.Code § 11–1906 (2001); *see, e.g., Maxwell v. United States,* 297 A.2d 771, 774 (D.C. 1972) (noting that master jury list contained names, ages, and occupations *inter alia*); A qualification form is mailed to these prospective jurors who must meet certain criteria in order to be qualified to serve. *Id.* This form also contains information on a prospective juror's race. Qualified jurors are then en-

It is prudent to follow the federal courts' approach, which has recognized and deferred appropriately to the inherent expertise of the trial court in discovery matters. We acknowledge repeatedly in our cases that the trial court is in the best position to determine the scope of discovery due to the very fact-specific and fact-intensive nature of these requests. *See, e.g., Pardue v. Center City Consortium Schs. of Archdiocese of Washington Inc.*, 875 A.2d 669, 678 (D.C.2005). Despite the majority's admonition that the functioning of the Criminal Division of Superior Court may grind to a halt as a result of these motions, I note that the federal district courts certainly have not ground to a halt as a result of these motions—nor has any suggestion been raised—that their lighter dockets were somehow especially burdened as the result of motions filed pursuant to the FJSSA.[6] In fact, a Westlaw search reveals that since the passage of the FJSSA 40 years ago, only 20 district court cases have addressed FJSSA claims—a far cry from the floodgates being opened.

Under the majority's heightened standard, a litigant is forced to put the proverbial cart before the horse. That litigant must prove—or prove to a lesser degree—the merits of his constitutional claims in order to garner access to the non-public and confidential information necessary to prove the merits of his/her claim. In light of how important statistics are in proving discrimination claims under the Fifth and Sixth Amendments, the practical implication of the majority's holding is inconsistent with the reality that "without inspection, a party would invariably be unable to determine whether he has a potentially meritorious jury challenge." *Test, supra,* 420 U.S. at 30, 95 S.Ct. 749. Here, the majority—citing *Rojas v. State*, 288 So.2d 234, 237 (Fla.1973)—admonishes against a "fishing expedition" where the defendant is unable to even make a modest showing of discrimination. But there is no such "fishing expedition" here. In this case, the Public Defender Service ("PDS") retained, at its expense, an expert who, along with two PDS staff investigators, observed nine different jury venires of one Superior Court courtroom over the course of one day.

The majority places great weight on D.C. Superior Court Judge Boasberg's conclusions in *United States v. Odell Powell*, No. 2006–FEL–23645 (D.C.Super.Ct.June 17, 2008), particularly with regards to Judge Boasberg's calculation of the number of Black adults in the District according to the 2000 Census—56.2%. The majority, however, attempts to compare that statistic with that of Black and *Black Latina* members of Mr. Gause's jury pan-

tered into a master jury wheel, which forms the basis for the random selection of venires for grand and petit juries. D.C.Code § 11–1904; *see also* "Superior Court of D.C.—Special Operations Division, Jurors' Office—Frequently Asked Questions," *at* http://www.dccourts.gov/dccourts/superior/ (noting that master jury wheel contains the names of qualified jurors).

6. Although the majority is concerned about the possibility that litigants, en masse, will file motions under the DCJSA but for the imposition of a heightened standard, I note that such an improbability is significantly undermined

by the majority's own acknowledgment that the Public Defender Service "is surely a resource available to other defense counsel in cases of this kind." Indeed, the availability of the Public Defender Service to "furnish technical and other assistance to private attorneys (who have been) appointed to represent [criminal defendants pursuant to the Criminal Justice Act]," D.C.Code § 2–1602(a)(2), would certainly provide an incentive to the criminal defense bar to act in coordination with the Public Defender Service to determine the merits of such claims and thereby discourage the vexacious and fruitless litigation the majority fears.

el—a figure of 57.1%. The majority aggregates minority groups, thus retaining the 57.1% figure, but is not consistent when contrasting this percentage with the 2000 Census data. According to the 2000 Census, the combination of Black and Latino adults constituted 63.5% of the District of Columbia's 2000 population. Unlike under the majority's calculus, where Mr. Gause's jury panel possessed a greater percentage of Blacks vis-a-vis the population in the District, a more precise analysis indicates that it actually possessed a lower percentage-a 6.4% gap. Therefore, the majority is arguably erroneous where it devises its 57.1% of jurors selected in *Gause* by aggregating seven Black and one "Black" Latina juror.[7] The 2000 Census does not provide "Black Latino" figures for the District of Columbia. It provides data for "Black alone" and "Latino of any Race." With nothing more than the descriptor, "Black Latina," these two, distinct, Census demographic groups should not be aggregated. The more appropriate number is seven Black jurors, and thus a 50% Black jury panel make-up. Compared to the

adult Black population in the District in 2000, this leaves Mr. Gause with a 6.2% gap.[8] Furthermore, the majority asserts, **on page 677**, that the "percentage of [B]lack persons in the jury was slightly above the percentage of [B]lack adult citizens of the District, (less than 56%, as estimated by Judge Boasberg in his opinion in the *Powell* case.)." Even if this assessment was accurate, which I do not concede, conviction beyond a reasonable doubt by a properly constituted and racially representative petit jury does not eliminate the taint imposed on the administration of justice by impermissible racial discrimination at any earlier stage in the jury selection process. *See Rose v. Mitchell*, 443 U.S. 545, 559, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979) (holding that racial discrimination in grand jury selection was a valid ground for setting aside defendant's criminal conviction despite the fact that defendant had been found guilty beyond a reasonable doubt by a properly constituted petit jury at trial).

The majority seems to suggest that litigants could rely on and be bound by Judge

7. For analysis of unconscious bias as applied to juries, *see* Honorable Janet Bond Arterton, *Unconscious Bias and the Impartial Jury*, 40 CONN. L.REV. 1025 (2008). Furthermore, 71.5% of Whites, 67.5% of Asians, and 60.5% of Latinos harbor such biases. Anthony G. Greenwald & Linda Hamilton Kreiger, *Implicit Bias: Scientific Foundations*, 94 CAL. L.REV. 945, 958 (2006). There is a precipitous drop when Blacks are analyzed; only 32.4% harbor an unconscious anti-Black bias. *Id.* Thus, although all racial groups harbor a significant amount of unconscious anti-Black bias, the distinction between Blacks and non-Blacks attitudes is great. It, therefore, makes sense to dis-aggregate Blacks from non-Blacks—including Black Latinos—when the issue at hand relates to potential racial attitudes, as we find with debates about the racial composition of juries.

8. Empirical research strongly suggests that there may be race bias against the selection of Blacks in jury wheels and master jury lists.

Jeffery Sobal & Donald W. Hinrichs, *Bias against "Marginal" Individuals in Jury Wheel Selection*, 14 J. CRIM. JUST. 71, 77–78 (1986). *See generally* Samuel R. Sommers & Omoniyi O. Adekanbi, *Race and Juries: An Experimental Psychology Perspective*, in CRITICAL RACE REALISM: INTERSECTIONS OF PSYCHOLOGY, RACE, AND LAW 78–93 (Gregory S. Parks et al., The New Press 2008) (providing a broad overview of the empirical research on race and juries). These biases may be unconscious, which courts have long recognized. *See Grutter v. Bollinger*, 539 U.S. 306, 345, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (noting that "[i]t is well documented that conscious and unconscious race bias ... remain alive in our land ..."). Courts have also recognized these biases in the context of juries. *See McCleskey v. Kemp*, 481 U.S. 279, 333, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (noting the unconscious bias of jurors) (citing *Turner v. Murray*, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986)).

Boasberg's conclusions in *United States v. Odell Powell*, where the majority notes that "he discussed, in considerable detail, jury selection practices in the District, as well as their racial consequences." However, notwithstanding the comprehensive nature of Judge Boasberg's decision, a litigant in a criminal trial should not be required to rely on or be bound by findings in an unrelated criminal case to "determine whether he has a potentially meritorious jury challenge." *Test, supra,* 420 U.S. at 30, 95 S.Ct. 749.

More troubling, however, are the broader implications of the majority's holding. First and foremost, a litigant who cannot meet the heightened showing the majority imposes due to a lack of resources—such as investigators, time, money—cannot access the necessary statistical information any other way, as these records are exempted under the District of Columbia Freedom of Information Act.[9] The majority's adoption of this standard—along with what is necessary to meet this additional "reasonable belief" standard—effectively limits constitutional and statutory jury selection challenges in a manner that is not required by the language or underlying purpose of the DCJSA statute. The reality is that too many of the litigants seeking this information lack the resources to surpass this additional hurdle that the majority has imposed today, in order to vindicate their constitutional rights.[10]

Furthermore, by adopting this heightened standard, the majority also imposes a greater burden on litigants who raise challenges at earlier stages of the jury selection process than in the later stages. For example, a litigant who challenges the composition of a master jury wheel, which contains the names and other identifying information of qualified jurors, will encounter greater difficulty in attempting to determine from other sources, which residents were on the source lists for the master jury wheel and which residents actually were qualified to serve. Determining this information would require much more time, money, and effort than observing the jurors who are selected for the venire panel in certain courtrooms on specific days, in support of a challenge to the composition of individual jury venires, which Mr. Gause offered. The additional and heightened standard the majority imposes has a different impact depending upon where the litigant's challenge falls along the spectrum of the jury selection process. The majority's approach could potentially serve to shield infirmities in the jury selection process that occur during the most crucial stage—ensuring that the broadest and most representative segment of the District of Columbia residential population forms the jury pool, from which the individual grand and petit jury venires are constituted.[11]

The majority's decision unnecessarily imposes an additional hurdle and require-

9. *See* D.C.Code § 2–534(a)(6) (2001).

10. "Discrimination on the basis of race, odious in all aspects," is "especially pernicious in the administration of justice." *Rose,* 443 U.S. at 555, 99 S.Ct. 2993 (holding that racial discrimination in the selection of grand jurors violated criminal defendant's equal protection rights under the Fourteenth Amendment).

11. *See* John P. Bueker, Note, "Jury Source Lists: Does Supplementation Really Work?"

82 CORNELL L.REV. 390, 408–09 (1997) (noting the open question of whether a court should examine the representativeness of the jury source lists or rather its effects on the resulting qualified pool); Ted C. Newman, "Fair Cross–Sections and Good Intentions: Representation in Federal Juries," 18 JUST. SYS. J. 211, 219 (1996) (noting that "[i]t is reasonable to presume that an unrepresentative qualified wheel will yield unrepresentative venires").

ment on litigants in D.C. Superior Court who seek to challenge the unfairness of their jury. Such a requirement is contrary to the clear purpose of the District of Columbia Jury System Act.

For all of the foregoing reasons, I respectfully dissent.